Thank you, and may it please the Court, I'd like to reserve three minutes for rebuttal. Two errors of law require that the District Court's preliminary injunction be reversed. First, HiQ did not even plead a plausible violation of California's UCL, much less prove any likelihood of success. The UCL does not give HiQ a right to free ride on the business of LinkedIn built. But that is exactly what the District Court ordered. And by putting the force of law behind that kind of free riding, the order actually threatens the very values of competition and innovation that the District Court thought it was protecting. Kagan. Could I ask a procedural question? My understanding is that the UCL is the affirmative basis for the injunction.  The CFAA was a — the request for relief on that was, was it purely a declaratory judgment or was it in any way wrapped into the injunction? The way in which the issue arose, as I understand it, Your Honor, is that it was — it's purely a declaratory judgment claim on the part of HiQ that the District Court reached it in the course of adjudicating the preliminary injunction. And, in fact, the overwhelming majority of the Court's legal analysis is the CFAA, the UCL's almost an afterthought at the end of it, because it would have provided an alternative ground on which the preliminary injunction could have been denied. In other words, that the CFAA would preempt the UCL claim if, if indeed HiQ's conduct. But they didn't — but it's not an affirmative basis for the injunction. It's definitely not an affirmative basis for the injunction. And that is why I think the Court could resolve this case solely by concluding that there's no likelihood of success on the UCL claim, and that would certainly suffice to resolve the case. But I will say the CFAA is going to be a significant issue on remand no matter what happens to this injunction. So there probably is a pragmatic reason why some clarity on the — on the statute and its application would advance the ultimate resolution of the proceedings. And if I could just make a point about the substance of the CFAA, and then I'll turn back to the UCL if I could. We think that the CFAA ruling by the District Court is equally unsound, equally threatening to the values that the Court thought it was protecting. HiQ was doing exactly what the CFAA forbids when it deployed its anonymous bots to scrape LinkedIn's servers after LinkedIn sent a cease and desist authorization. Companies like LinkedIn rely on the CFAA to protect themselves against this kind of exploitative free-riding. You can see that in the numerous cases that we've cited at page 40 of our opening brief. If we no longer can rely on the CFAA to protect ourselves in this way, that's going to create very substantial pressure for companies that now have public-facing websites to pull them back behind password walls, which will of course diminish the free flow of information, which again will accomplish exactly the opposite of what the District Court thought it was trying to accomplish with its CFAA ruling. Is that consideration, i.e., behind the password walls are not relevant to the UCL question? So I don't — I think it's relevant in this sense, Your Honor, in that if there is a UCL — If the court were to affirm the UCL, the District Court's ruling on UCL cause of action, it's going to create exactly the same kind of pressure on the part of companies like LinkedIn to pull their now — the data that they now make available on their websites to the public back behind a password wall because that's the only way they're going to be able to protect themselves from the free ride. One is that it was a tentative ruling on a fairly low likelihood standard, as I understand what Judge Chen did. In other words, it was not — unlike the CFAA ruling, which seems to be a fairly pure legal ruling, this one was really not. I would take issue with that, Your Honor. I do think it's a legal ruling, and I think there's a clear error of law that's at the core of what Judge Chen ruled. Now, if I might, I'd like to just take a second on the standard and then talk about what I think the error of law is. On the standard, I actually think that, you know, the guidance should come from the Supreme Court's decision in the Winter case, in which the Court made clear that likelihood of success — that, you know, a preliminary injunction is an extraordinary remedy. Likelihood of success is the most important consideration. And what this — what the Ninth Circuit, of course, has said — And therefore, Behar was a sine qua non. Well, I think you're — I'd just ask, Your Honor, to take another look at Winter, because I think it says that likelihood of success on the merits is the key consideration. And indeed, one of the cases that we've cited in our standard review section of our opening brief, you will see that the law of the Ninth Circuit, as we understand it, is that unless a party is shown likelihood of success on the merits, or at least a serious question, you don't get to the equities at all. That's right. It's unless a serious question. And he's had a serious question. Well, I guess what I would say about that is that in a situation like this, where it's a mandatory injunction, which tells us that we have to disable the technical barriers that we have in place, we have to allow this free riding to go on, and we have to — and we're not allowed to invoke the CFAA, which we otherwise would have a right to do, that that — that that's a situation in which, again, as I think the law of this Circuit suggests, that when you impose mandatory obligations, rather than just preserve the status quo, you've got to show a substantial — But isn't the question of the status quo, depending on when in time you say the status quo existed, because at one point you weren't imposing these barriers against High Q, and they're trying to simply go back to that time period, aren't they? And isn't that — in that sense, isn't it prohibitory rather than mandatory? I don't think so, Your Honor, because the technical barriers that we list, and you'll see the number of them listed on page 7 of our brief, were all in place generally. And one of the points we've made, of course, is that we block — LinkedIn blocks 95 million bot attempts a day, and that was including High Q's bot attempts through those — through those technical barriers that were in place. And when we became aware that High Q specifically was doing what it was doing, we sent them a cease and desist letter saying, your authorization is revoked. And they kept doing it, finding ways to evade the technological blocks. And what the district court's order does is require us to essentially whitelist them, say all of those generally available blocks can't operate against High Q. There's no doubt that's a change in the status quo. It would be helpful to me to get to the merits of the UCL issue and also to leave some — and let's just say that we're going to give you at least five extra minutes and we'll see. Okay. Go ahead. Thank you. So on the UCL, I do think — here's the key on the UCL and why I think, even if you're just applying the serious questions standard, why I don't think they come anywhere close to meeting it. That under the UCL, essentially what — and this is the CELTEC case — you've got to show either a violation of the antitrust laws or what the court described as a violation of the policy in spirit, but it gave a specific definition to policy in spirit. And the specific definition it gave was it has to either — it has to either be a violation or it has to — it has to be conduct, the effect of which is identical to or comparable to an antitrust violation or otherwise imposes a significant harm to competition. And the court stressed it was the competitive process, not an individual competitor. Now, the way the California courts have applied this — and I point this court in specific to two cases, the People's Choice Wireless case and the Chavez case, both of which we hear that you will — you do not have a claim under the UCL in these circumstances. People's Choice Wireless was a refusal-to-deal case, just like this. And the court said refusals-to-deal are not actionable under the antitrust laws and they're therefore not actionable under the UCL. And here's why. It's because if you look at what the Supreme Court has said about refusals-to-deal, that when you impose an obligation-to-deal, a duty-to-deal, even on a monopolist, that's not pro-competitive. That is anti-competitive. And I would really point the court in particular to what the Supreme Court said, unanimous Supreme Court said, in Trinco, it's anti-competitive because it discourages innovation and investment and hard work to build the business that the other company wants the free ride on, and it discourages the free rider from actually building a better mousetrap and instead giving them a right to free ride. And so I think that, and so the California courts have unambiguously rejected the refusal-to-deal claim that's really no different from the one here. And in Chavez, Chavez was not a refusal-to-deal claim, but if you read Chavez, you will see that the California courts, and the California Court of Appeal again in that case said that you cannot plead, you cannot bring a UCL claim simply by alleging things that would fail as an antitrust claim. In other words, you can't, if you don't have an antitrust claim, you just can't slap the UCL label on it and get passed. Kagan. But it's not true that it has to be actionable under the Federal antitrust laws. So what the courts have said is that only in unusual circumstances will it be more expansive. And as another point, I do think of judicial process, which is important here, that we're talking about a State claim, and HYCU has not identified a State case that comes anywhere close to justifying the cause of action that they've brought here. We're in Federal court, and it just, you know, I think it is appropriate for Federal courts, as they do, to be extremely circumspect about adopting very, very expansive constructions of State law. Well, of course, we could always certify the question, which we have been doing to the But it is so clear here that I don't think there's any need for it. And I do think that kind of circumspection about clarifying it is important. Sotomayor, could I slip in and ask a question? This case, Zelchek, is extremely unclear, it seems to me. Well, I understand that. It's amorphous and it's vague. I understand that, Your Honor, but the guidance, I respectfully suggest that the Court should take guidance from People's Choice Wireless and Chavez, which are absolutely unambiguous statements of California law by the California Court of Appeal. Yes, Your Honor, I'm sorry, I didn't mean to. Oh, thank you. I'm somewhat concerned about this argument about the UCL, but I'm not sure we need to get to it. For example, we could affirm on an alternative ground of your tortious interference. So it brings up the issue that we've said again and again and again, don't come up here seeking for a ruling in these preliminary injunction case. Go ahead and get it tried or enter into some type of a compromise where you can get a stipulated judgment, then we can look at it. So it becomes crystal clear that that decision, those decisions we've made, and we've said it more than once, that we're better off not going into that area. It seems to me that you've got a relatively strong, there's a relatively strong case of affirming on the basis of the tortious interference case. So I would hope that you might get to that issue, too, because we could affirm the district court on that alternative ground. Yes, respectfully, I don't think the court could do that, and that's true for a few reasons. One, in the footnote in which the district court dealt with tortious interference, and it was just a footnote, it said that the tortious interference claim is a valid claim for the same reasons that the UCL claim is a valid claim. That's how the district court described it. I hope I've persuaded your honors that the UCL claim isn't valid or plausible, and so the district court's reasoning doesn't. Well, for the same reasons, meaning based on the same actions, it's obviously you can't, I mean, antitrust law is one thing, tortious interference is another. If I get to the second and third points that the district court didn't rule on and that are quite significant, the first is that if we have a legitimate business purpose for our action, then there is no tortious interference claim. We definitely have a legitimate business purpose for our action here. We're trying to protect the integrity of our relationship with our members, and that's at the core of our business. Now, I think- But the allegation is that what you're trying to do is that you were perfectly happy to have this whole thing going on until you decided to get into a competitive business yourself, or LinkedIn decided to. I mean, this is the claim, and that at that point, you decided to cut off their ability to get the data because you wanted to use the data for an essentially parallel purpose. Now, I know you say that you're differently going to deal with the do-not-broadcast requests, although they say that is necessarily true, so that looks like a factual conflict. But nonetheless, there is a factual question, is there not, of what the actual motives were here. So I think, you know, I don't think there really is a serious factual question about that, Your Honor. There isn't any evidence in the record that LinkedIn knew that HYCU was engaging in the kind of data scraping that it was engaging in. That's the very point we pointed out before. Very often in these preliminary injunctions, you don't get the full picture. When you go back and try the full case, we get the full picture. Right. I appreciate that, Your Honor. But I do think it's important to understand, and this goes, I think, both to an understanding of the merits, but also to an understanding of the equities here. We're now in a situation in which, you know, under the way we run our business, we're accountable to our members. We tell them, for example, with respect to do-not-broadcast, which 50 million of LinkedIn's members have invoked and 28 million in the last year, we tell them that when they change their profiles on LinkedIn, we won't broadcast that change. The reason, as you can see from one of the Rockwell declarations, which is in the appendix, in the record excerpts, the reason that we put that in place seven years ago was because of the concern that members raised that when they changed their profiles, their employers would get notified and they were concerned that their employers would think they were looking for another job, and we were trying to protect them from exactly that thing. And of course, their employers could check their profiles anyway, couldn't they? Well, they could in theory, Your Honor. Sure. Well, they could if they wanted to. But the point, I guess, of what we're trying to get across here is that in that way and in other ways, for example, when they terminate their membership, we delete their information. We're accountable to our members in all those ways, and HiQ, when it scrapes the information, is not accountable in any of those ways. When we don't broadcast, they do broadcast. When we terminate, take the data off of our servers, they keep the data. They're not accountable. And that's why you've got an amicus brief from one of the foremost internet privacy organizations, Epic, here, weighing in on our sides. And this is a significant issue. It goes to the equities, but I do think it also should convey, Your Honor, that we have a very serious legitimate business justification for taking the steps that we took, and if so, there's no tortious interference claim. And then in addition, of course, HiQ, and this is also factual evidence in the record, HiQ entered into several contracts with LinkedIn, each of which incorporates the Terms of Service. The Terms of Service specifically bar the kind of data scraping activity that HiQ was engaged in. So it violated the terms of each of those three contracts with us. Are there any currently binding contracts? No, but there were. Well, no, but I think there were when they did what they did. But they're still doing it. Right, Your Honor. But we have to- This is all an injunctive case at this point, right? Yes, but we had the right to defend ourselves. We had the right to defend ourselves against their conduct that breached- But if there's no contract now, that's not going to do you any good going forward. But, well, I'm not, I don't, forgive me, Your Honor, I don't know whether there's a binding contract now. When it happened, there was a binding contract. And that, it seems to me, is more, an independent and more than sufficient justification for why this wasn't- A little bit more in the weeds on the UCL, and then I guess we should get to the CFA. It's my understanding there were two other claims of antitrust-like behavior. I mean, this is why I have problems with it. I don't know what point the like matters. But illegal monopoly leveraging and essential facilities doctrine. Now, I understand that neither of these may work under the current antitrust laws. And is that the whole answer? In this case, it is, because both, in this case, the monopoly leveraging consisted of their allegation that we refused to deal with them. We refused to cooperate. And the essential facilities- Because, as my understanding, because you want to leverage it, the use of the status by competing with them. But under, so- Or by thriving by the business, essentially. Under the, it's quite clear under the law of the circuit that that's not an antitrust problem. Right. Okay. But then what? What do we do with the UCL at that point? So I think what I've suggested is that the California courts have told you what to do in a refusal to deal case. They have told you that refusals to deal are not actionable even under the expanded definition of CELTEC. That is what the people's choice- And even if there's a monopoly leveraging problem. Even if there's a monopoly leveraging problem. Well, sure. There was, that was exactly what the allegation was there, that the manufacturer of the cell phones had a monopoly. And so I just think if you look at that case, California has already told you it doesn't apply in the setting in which it was applied here. And that's true with respect to, and essential facilities, of course, is that that's just another label for refusal to deal. And I do, and I, so I think that since it is, and I, and I do think this is important that this goes back a century to the Colgate case, now admittedly under federal law, but it goes back to the Colgate case a century. It's always been the law that companies get to choose the companies with whom they do business. And that it's not a problem under the- But of course the allegation here is that you, you could have chosen, but in fact you, you put it all out publicly. And then the question is, when can you un-choose somebody when it's otherwise publicly available? You're not generally choosing. Sure. But, but I do think, and these facts are undisputed, we block 95 million bot attempts a day to, to scrape this data from our websites or otherwise access the websites. We're not making it available indiscriminately to everybody through bots. Quite the opposite. I wondered about whether you could have some, you don't seem to, could you have some policy of use that said, without having a password that just said, people allowed, bots not allowed? It is, those are the terms of service. Those are precisely the terms of service now. With regard to public docu- Yeah, no, anybody read the LinkedIn terms of service, that's what they say. Now I recognize that everybody reads them, but that's what they say. And they were, those were the terms of service that were incorporated by reference into the three contracts that, that IQ signed with LinkedIn. So- But LinkedIn allows some kinds of search engines to operate automated processing systems like these bots, doesn't it? Well, not like these bots. It allows two. It allows Google and Bing. Those are search engines. It allows that because doing so is consistent with LinkedIn's business and consistent with the interests of its members. Well, it's in, it's in their profit interest as well, isn't it? Well, sure. But it is a for-profit business, but it's in the, but it is in their, it advances the business because the members who decide to make their information public want people to be able to find it. And the search engines is the way you- I don't want to get to the CFAA issues at all. So would you like, I'd be happy to turn to that now, if you want. All right, well, I'll give you about three or four minutes. Three or four minutes. Okay. So- Because I'm sure that's what the other side is going to argue. So just some key points. On CFAA, the question, it comes down to whether this, their access to the website is without authorization. They've made the claim that it's without, that by definition, it's with authorization because once you have made information public on a website, it is impossible that to revoke authorization. And I would, I would just try to approach that in several ways. First, think about the facts of this case. We put up all these technological barriers, which I've described, which are described at page seven of the brief. We put IP blocks in place to try to prevent, IQ in particular, from engaging in this kind of scraping. We sent them a cease and desist letter saying, we're revoking your authorization to access our website because you've been scraping. And under any common sense understanding of the phrase without authorization, their conduct after those things that happen is without authorization. And I think the idea that you can't, that you can't revoke authorization to access to a public website, it's just a non sequitur. I mean, I think about it, like for example, think about a bookstore. If I own a bookstore, it's open to the public. Anybody can come in to the bookstore. So it's open to the public and the information in the bookstore is available to the public in that sense. But if somebody's shoplifting and I catch them, I can bar them from coming back. Now my bookstore is still open to the public, but their authorization has been revoked. And so I just think, and I really think that that's the right way to think about what's happening here. Well, that's only if, I mean, their version is we're not shoplifting. We are only doing what the material is out there for, which is viewing it. Yes, we are using a technological tool to help us do that. But we are not stealing anything that isn't out there for anybody who wants to take it. If we wanted to hire, you know, 1 million monkeys who could go and do the same thing, then there would be no problem, apparently. But you know what that's just like, Your Honor? That's just, I would say, the right analogy, right way to think about it. And it's a case we cite in the briefs, Fourth Amendment case, United States against Jones. That was the case about placing a GPS device on an automobile so you could track its movements. Yes, and also the cell phone case. And I mean, some recognition of the fact that you're saying that the aggregation itself is qualitative, not just quantitative. What the justices held in that case is that it's a difference in, yes, difference in kind, not in degree. And that is certainly true here. There's definitely a difference in kind. And we do, as I said, we block 95 million bot access attempts a day. And as a legal matter, of course, they've conceded that they are trying, that they are accessing the website. So it's not that they're standing, you know, Judge Chen used that metaphor, standing on the sidewalk, looking in. But they're accessing, they're going to the computer to get the information. But again, here the accusation is that the way you want to keep them out is because they're competitors or potential competitors. I mean, there are, in the amicus briefs, a lot of suggestions that to allow this is really to cut off a means of acquiring knowledge by people who want to do data research, want to look at political websites, want to look at all manner of websites, which are publicly available and do this kind of technologically available data aggregation, which then does big data manipulation, whatever that means, and finds things out. And that if we determine that you can do what you want to do, then all these other sites could do the same. So what I'd like to do in response to that question is first explain why I disagree with that argument that they're making, but then offer you a suggestion if you disagree with what I say. So with respect to why I think that that's just not right is that this statute has been in force for quite some time. And as you'll see in the cases, district court cases that we cite on page 40 of our opening brief, including Judge Breyer's three taps case, but several others as well, businesses with publicly facing websites have been invoking this statute to prevent the kind of free riding on their businesses that is here. Those cases have been around now more than a decade and they haven't given rise to the kinds of problems that the amici are identifying. And I think that's true for a number of reasons. One is that the statute requires not just that you gain access without authorization, but that you have to inflict at least $5,000 worth of loss. And so the idea of somebody... That's trivial. I mean, anybody's going to be able to do that. It may be in one individual instance, but the idea that you're going to try to use this $5,000 in loss to cut off the access of lots of people who you don't want to view your website, I just don't think that that's realistic. Also in this circuit, you've got to send a cease and desist letter before you can invoke the statute. So that narrows the breadth of the statute. And to the extent the court is concerned about the risks of discriminatory enforcement, I do think that the doctrine of selective enforcement could, district courts could say, we're not going to participate in that. Well, I'm not talking, I mean, I didn't find particularly persuasive the stuff about you're not going to let black people on. I mean, that's really not the problem. The question is what sorts of publicly available information is potentially of significant scientific and data knowledge use, which would be affected by this? That's what I'm concerned about. Yeah. And I just don't think that's a problem, but let me offer as a, just because this is the world we live in now and it's, nobody's able to point to any such problem occurring. But we don't live with it. I mean, as I understand it, there's always a delay in the litigation and the now, A, you have to have these huge bots. B, you have to have the big data analytics available. I mean, that's, you know, five, six, seven years, but it's not forever. So let me then offer, this is the, let me get the suggestion I wanted to offer, which is this, if the court has this concern, I do think that there is a way to read the statute more narrowly, to read without authorization more narrowly. And it would be this, that in a situation in which an entity is evading, you have, you're acting without authorization in the following situation. When an entity is evading anti-bot technological barriers and has received a cease and desist letter from the website operator. Now, I think if the court were to adopt that line, I think it takes care of a lot of the problems. Now, you know, as I said, we don't agree with that. We, we, but, but, you know, I'm here, Your Honors, questions and concerns. I'm trying to offer a suggestion, may address them, but I think that that addresses two sets of concerns. The two that Your Honors have identified. First, I think it addresses the concern about the individual viewing of the website, because individuals just viewing the website wouldn't qualify under that statute. And I also think with respect to the data gathering, Your Honor, to the extent that somebody is engaged in that kind of scientific data crunching activity that, that Your Honors hypothetical was premised on, to the extent that that, extent that that activity gets, first, first of all, it can always ask for permission to come on. And it seems to me, I don't know why a company wouldn't let them on, but if they don't ask for permission and they manage to get through the technological barriers and they get a cease and desist letter, at that point, there can be a dialogue between the company, the website operator, the person who wants to get the data. And again, under those circumstances, I don't know why anybody would think that they're, why people would object. The problem is, and I do think it's important to understand, the one real world problem you see is the problem that the cases we've identified, that involve QVC and Craigslist and Ticketmaster and these public-facing websites, is the companies that want to scrape that data, free ride, create a competing business without inventing the better mousetrap themselves and doing the hard work themselves. Okay, I think that's been very helpful. I'll reserve the rest of my time for rebuttal. The one thing I would be helpful if you, when you come back is I'd like to know, you said that there was something in the terms of service that does say no bots, i.e., not the user agreement, because that's only deals with members as I understand it, but something that's directed at the public. I'd like to see what that is. I don't have it at my fingertips. All right. Yes. Thanks. Well, overall, let's say an extra 15 minutes, how's that? Good morning, Your Honor. Judge Walz and I have another case this afternoon, so we've really got to get done. Anyway, go ahead. Thank you, Your Honors. Brandon Weishoff, may it please the Court. I'd like to spend my limited time making several points that I think help frame the issues. First of all, the injunction is not a mandatory injunction. There were two parts to Judge Chen's injunction, both of which restored the status to the last contested state of affairs before the litigation, before the cease and desist letter came and the litigation started. The first was that he had LinkedIn withdraw the cease and desist letter. That's in the record at ER 25, paragraph 2. The purpose for that was to allow us to continue our business the way we had always been doing it before we received the cease and desist letter without threat of civil and criminal liability until the judge could reach the merits of the declaratory relief claim on the Computer Fraud and Abuse Act and Penal Code 502 claims. That was the first part of his order. The second part of his order, and it's only the second part of his order that turned on the viability of our affirmative state law claims, was that he had LinkedIn remove the High Q specific IP blocks that they put into place at the same time they sent us the cease and desist letter. And that's in the record at ER 25, paragraph 1. If I may, I don't think this is really our central question, so I hope we will get to our central questions. Okay. So we disagree that the propriety of the injunction turns on whether or not we have an affirmative relief claim. Part of it does. The part that caused them to remove the High Q specific block turns on the viability of the State claim. But the first part of the order, the withdrawal of the cease and desist letter so that we can continue to operate even if they are putting blocks up without fear of criminal and civil liability, that part was. Well, first of all, in terms of criminal liability, nothing here is going to do you any good in criminal liability because nothing is going to be binding on the government and if the government wants to charge you, they can do it, right? That's true, Your Honor, but this is a dual civil criminal statute and this Court has repeatedly made that point in interpreting the statute. I understand it is, but in terms of what your interest is, well, let me back up a minute. It was interesting to me that LinkedIn's brief began with the UCL questions and that you dealt with that as a very minor part of the case. But you can't get an injunction, as I understand it, without a likelihood of success of some variety on the UCL claims. Is that right? The CFA stuff is not going to do it. I disagree with that in two respects. First of all, as Judge Wallace pointed out, the UCL claim is not our only claim. We have a tortious interference with contract claim, which is established on the record. Their justification is an affirmative defense on which they bear the burden of proof and Judge Chen rejected their justification, their privacy justification, as a factual matter in his preliminary injunction order. So the second part of it is that the the when you bring a declaratory relief action and you say, look, this is how we do business, we want to make sure that we're not violating the law by doing the business until that issue can be decided, we want you to say we can continue doing what we're doing without that without that cloud hanging over our head until you can reach the issue. That's why the judge had them withdraw the cease and desist letter to allow us to do that. So that part of the order, I don't think, depends on the need for an affirmative or You couldn't possibly walk into court and say I'm bringing a, if you didn't have an affirmative cause of action and say I want a declaration that the CFAA doesn't apply to me and I want you to tell you, tell them to withdraw this letter that says it does, even though I don't have any right to an injunction under the CFAA. Could you? I'm sorry, Your Honor. If all you had, if you didn't have any affirmative cause of action, could you come into court and say I want a declaration that they're not going to be able to sue me under the CFAA and I want an injunction in the meanwhile that they should not, they should have to withdraw their letter saying otherwise. Could you do that? I think you could ask a court, while it's determining the dispositive legal issue in the case, to say that you should be allowed to continue your business without threat of that liability during the pendency of the litigation and that the effect of that letter should be suspended during the pendency of the litigation. Absolutely, I believe that. You think in preserved jurisdiction it's not a preliminary injunction. I don't know what it is. It's a request for the court to declare that what you're doing is lawful and not unlawful. And that's what we asked. That was the primary purpose for bringing this case. I understand that. But that's why it's been sort of mystifying. Well, let me help demystify the ordering of the arguments, because I think it's important to how we got here. Almost the entire argument in the two hearings and all the briefing below was focused on the CFA issue. It's true, and that's why I started to wonder about it. LinkedIn came to court telling the judge, telling Judge Chinn, this is not about anti-competitive behavior. Anti-competitive concerns are not what we're dealing with. We're dealing with the privacy issues of our members. That's why we did what we did. It had nothing to do. It's a total red herring, this anti-competitive argument. That's what they told Judge Chinn. The words refusal to deal do not appear anywhere in the record below. They never made the point that they could refuse to deal with whoever they wanted. They ran from any suggestion that they were refusing to deal with anyone. They said the sole purpose for their action was to protect the privacy of their members. Judge Chinn rejected that argument as a factual matter, which is entitled to substantial, clearly erroneous deference standard on preliminary injunction review. He found that we had submitted sufficient evidence that they had either condoned or tolerated our automated scraping for years, and that they only made the decision to exclude us on the eve of launching a competitive product. Those are his factual findings. They can come here and try to convince you otherwise, but it's irrelevant on the record because those findings are entitled to the clearly erroneous standard of review, and they're clearly supported by the record. So that was their argument below. When they appealed to the Court of Appeals, they said that there was no information in the record that they did know about this before. I'm sorry, Your Honor? Mr. Farrelly said that there was nothing in the record to demonstrate that they knew of the data scrapping. Well, Your Honor, I believe that's the case. I'm asking you where that is. That's factually incorrect. It was my impression that it was, but I don't know. And so the Mark Wydick Declaration, which appears in Volume 5 of the Excerpts of Record at pages 987 to 999, lay out in detail how LinkedIn was coming to our conferences where we openly discussed our data collection practices and how they had not only attended those conferences for years, but that they had accepted an award from us at one of those conferences. They never put, they never disputed in the record that they knew we were scraping data and they never identified in the record when it was that they knew it. They, they, what, what they had, they had one, one of, and Mark Wydick's Declaration says that there were at least ten LinkedIn members who came to these conferences over a period of several years and they had one person, one of those ten, submit a declaration saying, yeah, I came and I accepted a reward, an award, and I knew a bit about their business, but I don't remember them telling me they were scraping our data. But in another part of his declaration he says, I understood they were collecting public profile information. So it's clearly in the record that they knew, and they obviously knew by the time they sent us the cease and desist letter because they said it in the cease and desist letter themselves. They've never put into the record when they knew. They've never put into the record how they knew, but they knew. And all of the inferences that are in the record is that they knew about it, and Judge Chen in his order specifically says they knew about it for years. In his irreparable harm, in the irreparable harm portion of his order, he points that out, that, that, you know, you're saying, you, you LinkedIn are saying you're going to be irreparably harmed, and yet you've known about this for years and at least tolerated it. How can you now come to court claiming irreparable harm? That's in Judge Chen's order. So as a factual matter, that's just incorrect. So let me, let me jump quickly to the tortious interference claim because it's so simple and so clear and doesn't have to get into any ambiguity that you find in the UCL claim. So on the tortious interference claim, in, in Mr. Wydick's declaration and in Mr. Gupta's declaration, Mr. Gupta's declaration appears in the record at ER 881 to 885, and in Exhibit K to that declaration, which appears in the record at ER 926. It lays out in detail how LinkedIn was informed of our contractual relationships, which we had entered into during this period of time where for years they were coming to our conferences and knowing about what we were doing, with customers to provide information derived from the data that we obtained from the LinkedIn website. It names those contracts by names. There are contracts with eBay. There's contracts with GoDaddy. There's a number of others that are in the record. LinkedIn was informed of that, in fact, when they sent us the cease and desist letter, and we tried to meet with them. Originally they refused to meet with us. We said let's talk about less drastic alternatives. This is all in these declarations that I've cited, too. They would not have that discussion. They would not do anything until we sued them. And so they knew with substantial certainty that what they were doing was going to cause us to breach those contracts with our customers. And the judge, Judge Chen, when he made his findings on irreparable harm, he said that we had credibly demonstrated that we would have to breach our contracts. As I understand it, there's a defense that centers on their business interests. I understand that, Your Honor. I'm going to get to that, because it's an affirmative defense. It's an affirmative defense. So let me just talk about what the elements of the claim are that we have to prove. They're set out in the Judicial Council California Jury Instruction 2201. We have to show there's a contract, the defendant had knowledge, we've shown that, that the defendant's conduct prevented performance or made performance more expensive or difficult. We've done that. Judge Chen found that we would have to breach them. That they either intended to disrupt the performance or knew that disruption was substantially certain to occur. They knew that. In their own cease and desist letter, they said that your business is built on this data. Judge Chen found that we would have to breach these contracts. That the plaintiff was harmed. We demonstrated that. And that the conduct was a substantial factor. We've proven our case, not just for preliminary injunction purposes, but if there was a summary judgment motion today, based on the record that we have today, we've established our prima facie case of tortious interference with contract. Their affirmative defense of justification, that's what it is. It's an affirmative defense. They bear the burden of proof on that. The justification that they gave Judge Chen was that they were protecting the privacy interests of their members. He rejected that as a factual matter for preliminary injunction purposes. The California Judicial Council Jury Instruction. Kagan. But if they're, this is the problem. I wonder whether this all collapses into getting back to something like the U.S.C.L. claim, because then if they come back and they say, well, actually our business purpose was we didn't want to give them all this data because we wanted to do a similar service ourselves, and so we didn't want them to have it. Okay. Let me address that. So the California Judicial Council Jury Instruction on this business justification affirmative defense, it's Instruction 2210, it appears in the record below, Volume 3 of the excerpts of record at page 415. You not only have to have a legitimate financial interest, and you not only have to act only to protect that interest, you have to act reasonably and in good faith, and you have to use appropriate means to protect it. So let's assume they are acting to protect their interest. Is it using appropriate means to protect the interest? Well, whether it is or not seems to be to depend on the antitrust laws of the U.C.L. No, they don't. In other words, what would be wrong with it? They're saying we didn't want to give this stuff away to them for free. They're just free-riding, and we have a competitive interest, and that's either a legitimate interest or it isn't a legitimate interest. How could I tell that? I have to look at some outside source, don't I? It's a factual issue for trial. What's factual? But what's the standard? The standard is that it's reasonable in good faith and appropriate means. These are traditional jury questions that balance the case law. Are you just going to throw it up to the jury whether it's appropriate for a business with no standards as to what's appropriate for a business to do? So, Your Honor, they know, and Judge Chen found, that for years we were doing what we were doing, that we had invested our business in this, that we had contracts to do this. They didn't come to us and say, you're going to have to stop, we're going to have some business engagement period, you're going to have some time to finish your contracts. Is it using appropriate means, when you have come and you've known for years what we're doing, to send us a letter overnight forcing us to breach our contracts with our customers, lay off our employees and shutter our business, is that using appropriate means to protect your interest when you have all along been knowing about it and either condoning it or tolerating it? I submit no, Your Honor, and Judge Chen found that there was sufficient factual evidence to support that claim for purposes of preserving the status quo until that issue could be fully vetted. This is a pretty simple common law claim. There is nothing in the California law of interference with contract or prospective economic advantage that requires you to either show, demonstrate, prove in any way, shape or form either an anti-competitive intent or impact. And there is nothing in the law, I mean, if all you had to do was say I'm protecting my own financial interests by whatever, you know, and I can do anything I want, I mean, this claim wouldn't even exist. It's a balancing. And it's inherently factual and the cases say that this defense is highly factual and appropriate for resolution only at trial. The cases say that. The Qualamine case talks about that. All of the cases on tortious interference talk about that. That claim alone supports the relief. All right. Unless there's a CFAA problem, right? So let's talk about the CFAA. Now, first of all, I gather that the CFAA would be preemptive of any such State law cause of action, would it? If the CFAA, in fact, didn't allow you to do what you were doing. If the CFAA, if they have a CFAA, if they are allowed to send us, as one of the billions of members of the public, a cease and desist letter so that we can no longer view a website that everyone else can see. But that, you know, I don't find that very helpful in the sense that you're not just viewing it. You're not just sitting there and looking at it. You're doing something else. Now, so we at least have to deal with the something else. Yes. I.e., can they treat the something else as something else? Yeah. And I, you asked me to address the preemption question, I thought, if I had understood your question right. So I was going to address that and then come back to the merits, okay? On the preemption question, in Nozzle I, the nine-member majority of the 11 panel, 11 judge and bank panel said that the CFAA acts, Congress acts interstitially. The CFAA was not meant to displace all other law, all other state law, all other misappropriation law, or anything else. So Congress is presumed to act interstitially, not to preempt common laws of general application. So even if our position is that even if the CFAA would normally give somebody a right to do certain things, to be protected from certain things, it doesn't give them a right to exercise their rights in a way that violate independent state law any more than any private property owner. You have private property, you can do what you want with it, but you can't hurt somebody else using your own property. So these rights coexist. We don't think that there's anything in the CFAA that indicates a congressional intent to displace other law, and we don't think there's a direct conflict between a web owner being able to protect himself under the CFAA and still do it in a way that doesn't violate other independent law. So that's on the preemption point. Let me get to the merits point, and let's talk about, you know, this big scraping issue that they're talking about, and the automated access point. So, in NOZLE 1, the nine-judge majority of the en banc panel said very clearly that this statute was meant to be an anti-hacking statute. It was not meant to be a statute to police web owners' terms of use or a statute meant to address misappropriation. And it said that the government's reading in that case, that it could address that, was actually a reasonable, plain-meaning reading of the statute, but that it didn't make sense, given Congress's purpose, that it was an anti-hacking statute. So what the court said there was that without authorization is directed at outside hackers, people who come in from the outside that don't have authorization that hack into the system, and that the term exceeds authorization was meant to address inside hackers, people who have authority to access the system, but who access certain files or information on the system that they were not authorized to access. And what the court said there is that for there to be liability under the CFAA, the conduct has to be inherently wrongful, such as breaking into a computer. That's what they said. The conduct at issue in Nozzle I that the nine-judge majority refused to find actionable under the CFAA was an employee who had credentials, authorized credentials to log onto the system, who stole all of the proprietary information of Korn Ferry on that system, took it with him, and set up a competing business immediately thereafter. The nine-judge majority panel said as egregious as that conduct is, it does not violate the CFAA. It may violate something else, but it doesn't violate the CFAA. So, then in the PowerVentures case, the Facebook versus PowerVentures case, Facebook is not like LinkedIn. It does not have a public portion of the website. You have to have a user ID and a password to log in. They have a closed system. And in that closed system, a competitor set up another website where it solicited from Facebook users their usernames and passwords to allow it, with their permission, to link to the Facebook website, send out promotions and emails that purported to come from Facebook but were really coming from PowerVentures. Within the closed architecture, the password-protected area of the Facebook website. So, if — I'm trying to understand the significance of the password protection. If LinkedIn was to eliminate all of the public access option, and in order to read anything, you had to go be a member and have a password, what that accomplishes for them, as I understand it, is they then have terms of service that would be applicable to the people who have the access, which could include no bots. Right? Well, it would keep — they could certainly do that. If they have a closed system, they can make the rules, because it's a closed system. It's not generally accessible to the public. They can make whatever rules they want in their closed system. Well, could they, for example, in the public system, say, this is public for people but no bots, but it's not public for bots, but publicly, without the password? Can they do that? Yes. Can they enforce it under the CFAA? No. They can do it. They can do it, and they can try to enforce it. My belief is it's an unenforceable provision, and I'll come back to why that is. But, yes, in fact, almost every web — there's probably not any significant website, meaning any business of any substantial size, that doesn't have that policy. They all have that policy. In what form? Posted on — Well, that's the thing. Under Ninth Circuit law, it's not binding on people who just come and land on the site. It's only binding on people who click on a — so there's case law in the Ninth Circuit that distinguishes between click-wrap and browse-wrap. In a click-wrap browser, if you click and you agree, you can be bound. But if you just — if it's just on their website and you land on their website, it's not binding. That's pretty clear Ninth Circuit law. So, yes, website owners, they all have these provisions, and everyone ignores them. Big companies, Amazon, Walmart, everybody else. Let me give you an example, because this is a really important example. You've probably had some of these cases at the Ninth Circuit, because there have been so many of them filed in California. There are these price misrepresentation cases where somebody gets sued because they say they're discounting from somebody else's price. Let me just give you parameters, okay? Four more minutes, all right? You have four more minutes. Okay. So big retailers, they've got to — in order to know what other people are charging across thousands of products, they can't just go look at, you know, somebody's website manually. They constantly are searching the prices of competitors through automated means on sites that say no scraping, and they're constantly adjusting their own prices to meet that competition. The amicus briefs from Electronic Frontier Foundation and from scrapinghub.com laid out in detail all the different types of scraping and bots that are used on a regular basis. So — And the reason it's not enforceable is because there's no contract with these people. There's no contract. So there's — you know, I mean, look, if they want to — when we get back to the district court, if they want to breach a contract case against us, they can do that. They can try to prove that. But it's not a CFAA violation. It's not a California Penal Code violation. And so let me get to some of their arguments about all these parades of horribles. The open Internet, they say if you adopt this rule, everyone's going to put everything behind password walls. No. Companies that can put something behind a password wall or a paywall, they do it. The companies — most companies don't do it because they can't do it, because it doesn't fit with their business model. They chose an open architecture, open to the public business model. The only reason people are posting information on their website in the first place is because they know it's going to be public and accessible to the world. That's the purpose of having a LinkedIn profile. It's your billboard to the public. I have a naive question, a technologically naive question. Yes. Often when you get onto a website, and what I don't know, this is my question, is it behind a password or not, they ask you to do something to prove you're not a computer. You're asked to repeat some letters or something to prove you're not a computer. Right. Right? Is that only operating after you're behind some paywall or something? Or could it be done at the front? Those are rate limiting, and those are bot protections that they put in place. And the problem is that you've devised a way to go behind them, basically. Everyone does, yes. I mean, basically, what these automated scripts do is they basically figure out ways to get onto the websites because websites don't know what the good bot traffic is and the bad bot traffic. They don't know. Okay? So if somebody's coming on to maliciously harm the site, they have these mechanisms to stop that. And if somebody does, they have remedies against that, including under the CFAA, because there's a provision of the CFAA that allows for that, whether or not somebody had access to authorize access to the system or not. If you send out a program to damage somebody's website, you're liable under, I think it's 1030A, 5A, I think it is. There's a specific provision that addresses it. Judge Chen actually addressed that issue in his opinion. But the system is still the idea behind the CFAA was to protect private information. And we're not arguing that in all cases you have to avoid a technological barrier to have a CFAA violation. For example, if I walk into somebody's office. But you are avoiding a technological violation, as I understand it, as we just described. But you're saying that's not a CFAA violation. I'm saying. The technological barrier being the attempt to keep bots out. I'm saying that rate-limiting, bot-stopping barriers like that are not a barrier. They slow access. They don't prevent access. There's no authorization required. There's no one there that's stopping you from getting in. It's not. I guess the analogy would be if you have a lock on your door and somebody has figured out how to pick the lock, that doesn't make it a legitimate entry. That's my understanding of their basic claim. No, that's their characterization of it. But I don't think it's an accurate characterization of what's actually happening in the Internet context at all. What's happening is, is that these websites, so they've chose to make this information. I am going to stop you right after this, so go ahead. Okay. So let me address the free-writing argument briefly, because I think it's pretty important. No, you really do have to stop. Okay. I'm sorry, what? You're done. You're 17 minutes over, which is about what Mr. Parilli was. Okay. So thank you very much. Thank you. Unless they may have any questions? No? Okay. Thank you very much. The Court has three minutes. Thank you. Three points, if I could. The third of which will involve tortious interference, and I'll provide you, Judge Burson, with the record sites you wanted about the terms of service. First, if the Court thinks that there is sufficient merit to either the tortious interference or to the UCL claim that we think there isn't, then I do think that the Court has to reach the CFAA issue, because while my friend on the other side has suggested it's, that it wouldn't preempt the State claims, it has to preempt the State claims. What they want is exactly what the CFAA bars. It would be, I mean, it's just a complete and total conflict. So I do think if that's the, we don't think that there's a substantial, that there's a serious question on either of those factual, on either of those causes of action. But if you think otherwise, I think you're in CFAA territory. Then in terms of the scope of the CFAA, my friend, again, he mentioned NOSA 1 and with a focus on hacking. I do think that this Court's subsequent opinion in Power Ventures is the key place to look coming, of course, after NOSA 1. And I think what's critical about Power Ventures is this. That was not a hacking case. That was a situation in which Facebook members gave this company, Power Ventures, their passwords. They gave them to it. They gave their passwords to Power Ventures. So they were using the, there was nothing surreptitious about it. It was a voluntary agreement by the Facebook members to give Power Ventures the passwords. So Power Ventures got in because they had the passwords because the members gave it to them. And the question was whether, given that, they had sufficient authorization such that their scraping of the Facebook servers to get the information they wanted was not without authorization. And what the panel of this Court in Power Ventures said, it expressly rejected that. And that's at page, it's at page 1068 of 844F3rd. And here's what the Court said. It said, for Power Ventures to, for Power to continue its campaign using Facebook's computers, it needed authorization both from individual Facebook users who control their data and their personal pages, and from Facebook, which stored the data on its physical servers. Permission from the users alone was not sufficient to constitute authorization after Facebook issued the cease and desist letter. The whole point of that ruling was that because the data resided on Facebook's servers, that Facebook got to control access. And by revoking access, by putting in place technological barriers and sending a cease and desist letter, revoking authorization, that any access that occurred after those steps was access in violation of the CFAA without authorization. It's plain and clear express holding of the case. It's what it says. And so I just think that, given that, the idea that a password wall is the without authorization under the CFAA just can't be right. It can't be right. Okay. Thank you very much. Thank you all. Your Honor, do you want me to give you terms of service facts? I don't mean to stand in front. Yes. Why don't you just give it to me. Fine. Very good. All right. Thank you. All right. Really, you've been incredibly helpful. This is obviously a learning curve for us in terms of the technological underpinnings. And I thank you. The case of IQ Labs v. LinkedIn Court is submitted, and we are done, finally. All rise.
judges: Wallace, Berzon, Berg